## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| Board of Trustees of the Public | ) | No. 04-CV-12378-RCL |
| School Teachers' Pension and | ) | |
| Retirement Fund of Chicago | ) | |
|    Appellant-Creditor | ) | On appeal from the Bankruptcy |
| | ) | (Ch. 7) Court |
| | ) | Case No. 03-14530-JNF |
| v. | ) | Hon. Joan N. Feeney, presiding |
| | ) | |
| Phillip W. Hyde | ) | |
|    Appellee-Debtor | ) | |


### APPENDIX OF APPELLEE


Richard L. Blumenthal, Esq.
BBO #047150
SILVERMAN & KUDISCH, P.C.
1320 Centre, Suite 203
Newton Center, MA 02459
(617) 527-1150
Attorney for Appellee-Debtor

# APPENDIX

Page

A.  MEMORANDUM  (dated and entered June 18, 2004) on Fund's Motion for Summary
Judgment  (Feeney, J.) ……………………………………………………..    1-19

B.  ORDER granting DEBTOR'S MOTION TO AVOID LIEN (Feeney, J.) ...    20-22

C.  RESPONSE BY PHILLIP W. HYDE TO MOTION TO DISMISS
UNDER  11 U.S.C.  § 707(a) …………………………………………….    23-45

# United States Bankruptcy Court
## District of Massachusetts

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

In re
**PHILLIP W. HYDE,**
    Debtor

**Chapter 7**
**Case No. 03-14530-JNF**

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

**BOARD OF TRUSTEES OF THE
PUBLIC SCHOOL TEACHERS'
PENSION AND RETIREMENT FUND
OF CHICAGO,**
    Plaintiff

v.

**Adv. P. No. 03-1358**

**PHILLIP W. HYDE,**
    Defendant

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

## MEMORANDUM

### I. INTRODUCTION

The matter before the Court is the Motion for Summary Judgment (the "Motion")

filed by the Board of Trustees of the Public School Teachers' Pension and Retirement Fund

1

of Chicago (the "Fund"), which the Debtor/Defendant, Phillip W. Hyde (the "Debtor") opposes, in part. Through its Motion, the Fund seeks summary judgment with respect to its two count complaint against the Debtor. Specifically, it seeks a determination that a debt in the principal sum of $317,678.16 is nondischargeable under 11 U.S.C. § 523(a)(2)(A), as well as a determination that the Debtor's discharge should be denied under 11 U.S.C. § 727(a)(2).

The Debtor does not contest the Fund's position that the principal sum of $317,678.16 should be excepted from discharge. He does contest, albeit belatedly, the Fund's position that his discharge should be denied. The Debtor also contests the Fund's assertion that it is entitled to prejudgment interest pursuant to Illinois law. The Fund maintains that Illinois law, which permits the imposition of interest from the time a fraud occurs, applies. The Debtor, however, maintains that Massachusetts law applies, which provides for prejudgment interest at the rate of 12% from the time a complaint is filed.

The Court heard the Motion on May 5, 2004. At the hearing, the Debtor opposed the entry of summary judgment on the Fund's § 727(a)(2) count for the first time. Following the hearing, he filed a "Motion to File a Post-Hearing Memorandum on the Section 727 Discharge Issue," which the Fund opposed. Nevertheless, on May 12, 2004, the Court granted the Debtor leave to file a memorandum.

The issue presented is straightforward: Does Massachusetts or Illinois law apply to the award of prejudgment interest? Subsidiary issues include whether the Fund has sustained its burden of establishing the absence of any genuine issues of material fact with

2

respect to its § 727 count, and whether the Fund is entitled to attorneys' fees and costs.

## II. FACTS

The material facts with respect to the Fund's § 523(a)(6) count are undisputed and can be readily summarized.[1] The Debtor filed a voluntary Chapter 7 petition on May 28, 2003. On Schedule F - Creditors Holding Unsecured Nonpriority Claims, the Debtor listed three claims totaling $20,876.70. He listed the Fund's claim on Schedule D-Creditor's Holding Secured Claims. Of the $20,876.70 in unsecured debt, the Debtor disputed only one claim in the sum of approximately $20,000 arising out of an automobile accident. The Debtor disclosed that his insurer is defending the claim. The remaining two claims relate to credit card debt.

On Schedules I and J - Current Income and Expenses of Individual Debtor(s), the Debtor listed one dependent, his teenage son. He also listed total monthly income of $2,136 from Social Security and monthly expenses of $4,005.83, including mortgage payments of $1,985.

The Debtor is the son of Marian Hyde ('Marian") who retired from the Chicago Board of Education over 35 years ago on June 22, 1968. Marian began receiving monthly pension checks from the Fund, an Illinois public employee pension fund with offices in Chicago, Illinois, after her retirement. According to the Affidavit of the Fund's controller,

---

[1] Because the facts pertaining to the Fund's § 523(a)(2)(A) count are not in dispute, the Court has taken the liberty of paraphrasing portions of the Plaintiff's Statement of Undisputed Material Facts in Support of Motion for Summary Judgment. The Court also takes judicial notice of the Debtor's Schedules and Statement of Financial Affairs.

Patricia A. Hambrick, the Fund has a total of 18,665 active pensioners, several thousand of which reside outside Illinois. Indeed, according to Ms. Hambrick, active pensioners live in every state and several foreign countries.

Marian died on April 28, 1982 in Chicago. Her death certificate reveals that she was 83 years old at the time of her death.

The Debtor failed to notify the Fund of his mother's death, and the Fund mailed Marian's pension checks from Illinois to Cambridge, Massachusetts.[2] In 1982, the Fund did not have any automated way to determine whether pensioners were living. Although it represented that it reviewed local obituaries and stopped pension payments when checks or mail were returned to its offices, it relied upon the honor of relatives and beneficiaries to notify it of a pensioner's death.

By 2000, the Fund had incorporated a number of procedures to ensure that it was not making improper payments. It obtained a quarterly "Pension Benefits Information listing" from the Pension Benefits Information Service, enabling the Fund to compare its active pension roll with Social Security Administration death records. If there were any discrepancies, the Fund attempted to contact the pensioner or a family member.

The Debtor submitted fraudulent documents to the Fund to intentionally conceal his mother's death from the Fund and to induce the Fund to continue mailing pension checks to him. For example, on September 17, 1997, fifteen years after her death, at a time

---

[2] The Court has no information about how the Debtor obtained Marian's monthly pension checks between the time of her death in Chicago in 1982 and the date the Debtor responded to its September 17, 1997 letter.

4

when Marian would have been 98 years old, the Fund attempted to verify that Marian was still living by mailing a letter to 26 Union Street, Cambridge, Massachusetts, the Debtor's address. The Fund requested Marian to verify receipt of her September pension check by sending it a notarized form along with a copy of her social security card.

On November 26, 1997, the Debtor returned the Fund's form with a notarized signature purporting to be that of Marian Hyde. He included the following handwritten note:

> Dear Pension People:
>
> We are sorry for the delay in returning this form to you. The letter was put aside and just re-discovered. Marian is frail and has good days and bad days and is difficult to get out of the house. We can't seem to find her current social security card and will look further and re-apply if we can't find it.
>
> I hope all is well. Thank you again for your support.
>
> The Hydes

The Fund relied upon the notarized signature and note, believing that Marian was still alive. It continued to send her monthly pension checks until mid-August 2000 when it learned that she had passed away.

In August of 2000, a Fund employee, Bessie Kartsounes checked the Fund's records and called the telephone number listed for Marian. Ms. Kartsounes spoke with a man who identified himself as Marian's son. That man was Phillip Hyde. He informed Ms. Kartsounes that his mother had suffered a stroke and was in a coma at his home. When Ms. Kartsounes accessed the Fund's health insurance provider's database, however, she

learned that no claims had been filed on Marian's behalf. The Fund immediately stopped issuing checks to Marian.

Shortly after receiving the phone call from the Fund, the Debtor wrote a letter to the Fund advising it that Marian had died at home. He included an obituary showing August 9, 2000 as the date of his mother's death. In his letter to the Fund, the Debtor stated: "Sadly, please be informed that my mother Marian Ward Hyde passed away on August 9. She died at our Cambridge home peacefully and quietly. As I told you she has been comatose since July 7 so we hope she did not suffer."

Because the Fund did not learn of Marian's death until August of 2000, it issued checks to Marian or to "Marian Hyde, c/o Phillip Hyde" from May 1, 1982 to September 1, 2000. It canceled the last check made payable to Marian dated September 1, 2000. The backs of each of the pension checks sent to Marian bear two signatures. One purported to be Marian's; the other was the Debtor's. The Debtor intentionally forged his mother's signature to the backs of the checks to induce the Fund to continue mailing checks to him. As a consequence, the Fund issued pension checks totaling $269,411.53. It also remitted withholding taxes to the United States Treasury totaling $25,222.65, and paid health insurance premiums totaling $14,024.73. It also issued rebate checks with respect to health insurance premium overpayments totaling $9,019.25, which the Debtor converted for his own use.

On January 18, 2002, the Fund made a demand on the Debtor in the amount of $317,678.16, plus statutory penalties, interest, costs and fees. Four months later, it filed a

complaint against the Debtor in the United States District Court for the District of Massachusetts, in which it alleged fraud and conversion and sought the recovery of $317,678.16. The Debtor pled his Fifth Amendment right against self incrimination and refused to answer any questions regarding his culpability.

On November 17, 2002, the United States District Court issued a writ of attachment in the amount of the Fund's demand against the Debtor's residence located at 26 Union Street, Cambridge, Massachusetts. Prior to that date, the Debtor obtained a $150,000 Home Equity Credit Line from Citizens Bank. According to the Fund's Statement of Undisputed Material Facts, which the Debtor did not contest, the Debtor repays the Home Equity Credit Line at the rate of $2,000 per month and uses the equity line to pay "living expenses for himself and his son." According to the Fund, it filed a motion seeking to attach the Home Equity Credit Line at Citizens Bank, which it averred had a value of $90,000, on December 13, 2002. The Debtor opposed the motion. At a deposition held on February 14, 2003, the Debtor stated that he transferred approximately $60,000 from the Home Equity Credit Line at Citizens Bank to an account at Cambridgeport Bank.[3] The District Court issued a writ of attachment with respect to the Debtor's Home Equity Credit Line approximately three weeks later on March 5, 2003.

As in this case, the Fund filed a motion for summary judgment in the District Court

---

[3] The Debtor disclosed in his Statement of Financial Affairs that he paid the law firm of Mendillo & Ross $30,000 within one year of the filing of his bankruptcy petition to defend the complaint brought by the Fund and to represent him with respect to a possible criminal indictment.

7

action on May 1, 2003. The Debtor obtained an extension of time to file an opposition to the Fund's motion up to and including May 29, 2003. One day before his opposition was due, he filed a Suggestion of Bankruptcy which coincided with the filing of his Chapter 7 petition.

In his response to the Fund's Motion in this adversary proceeding, the Debtor disclosed that he is a 64 year old widower with a teenage son. He further disclosed that he has been suffering from depression for over 22 years.[4] He stated that he attempted to resolve the Fund's claim by offering it an agreement for judgment in the amount of $318,000, an offer the Fund rejected. Finally, the Debtor stated that he petitioned the United States District Court for the District of Massachusetts for the appointment of a criminal attorney, that his petition was granted, and that he expects that criminal charges will be filed against him.

## III. DISCUSSION

### A. Applicable Choice of Law Principles

In Emery Corp. v. Century Bancorp, Inc., 588 F.Supp. 15 (D. Mass. 1984), the United States District Court for the District of Massachusetts articulated choice of law principles applicable to misrepresentation claims. It stated:

> The parties agree that Massachusetts choice of law principles govern which law should apply to the plaintiff's claims because this court's subject matter jurisdiction is based on diversity and the forum state is Massachusetts. Klaxon Co. v. Stentor Electric Manufacturing Co., 313 U.S. 487, 61 S.Ct. 1020,

---

[4] The Court notes that the Debtor's depression would have preceded or coincided with his mother's death in 1982.

8

85 L.Ed. 1477 (1941). The parties also agree that Massachusetts has abandoned strict adherence to the rule of lex loci delecti for many types of actions and has adopted a flexible approach to choice of law questions which is similar to the approach used in the Restatement (Second) of Conflict of Laws (hereinafter "Restatement"). *See, e.g.,* Pevoski v. Pevoski, 371 Mass. 358, 358 N.E.2d 416 (1976). The parties also agree that it is likely that a Massachusetts court considering this case would apply a rule similar or identical to the rule stated in Section 148(2) of the Restatement. This section states:

> When the plaintiff's action in reliance took place in whole or in part in a state other than that where the false representations were made, the forum will consider such of the following contacts, among others, as may be present in the particular case in determining the state which, with respect to the particular issue, has the most significant relationship to the occurrence and the parties:
>
> (a) the place, or places where the plaintiff acted in reliance upon the defendant's representations,
> (b) the place where the plaintiff received the representations,
> (c) the place where the defendant made the representations,
> (d) the domicil [sic], residence, nationality, place of incorporation and place of business of the parties,
> (e) the place where a tangible thing which is the subject of the transaction between the parties was situated at the time, and
> (f) the place where the plaintiff is to render performance under a contract which he has been induced to enter by the false representations of the defendant.

Id. at 17. *See also* Midlantic Nat'l Bank North v. Borg-Warner Acceptance Corp. (In re Mayo), 112 B.R. 607, 667 (Bankr. D. Vt. 1990).

In the context of litigation under Mass. Gen. Laws Ch. 93A involving unfair or deceptive acts or practice in the conduct of a trade or business, the United States Court of Appeals for the First Circuit set forth several considerations for determining whether

conduct occurred "primarily and substantially" in Massachusetts.[5]  *See* Playtime, Inc. v.
LDDS Metromedia Communications, Inc., 123 F.3d 23 (1st Cir. 1997).  Citing, *inter alia*,
Bushkin Assocs., Inc. v. Raytheon Co., 393 Mass. 622 (1985), a case involving certified
questions to the Supreme Judicial Court by the First Circuit, it stated:

> The Supreme Judicial Court has outlined a "pragmatic, functional approach,"
> for determining whether alleged misconduct occurred "primarily and
> substantially" in Massachusetts.  Its approach has been distilled into three
> principal inquiries: "(1) where the defendant committed the deception; (2)
> where plaintiff was deceived and acted on the deception; and (3) the situs of
> plaintiff's losses due to the deception."

Id. at 33 (citations omitted).  It added:

> As we noted in Clinton Hospital, however, in approaching the second
> Bushkin inquiry the location of the person to whom the deceptive statements
> are made is of special significance, as distinguished from the location of the
> person who uttered the deceptive statements, since "[t]he victim's ingestion
> of a deceptive statement and the subsequent effects from reliance on it are
> what give the deceptive statement its venomous sting."

Id.  (citing Clinton Hosp. Ass'n v. Corson Group, Inc., 907 F.2d 1260, 1265-66 (1st Cir.
1990)).

Applying the applicable factors set forth in Emery and using the approach set forth
in Playtime as a guide, it is clear that a Massachusetts court would apply Illinois law.
There is no dispute that the Fund acted in reliance on the Debtor's misrepresentations in
Illinois and that the Fund received the Debtor's misrepresentations in Illinois, although the
Debtor made the misrepresentations in Massachusetts.  The Fund has a principal place of

---

[5] The Court recognizes that Playtime involved conduct proscribed by statute and
that the principles articulated by the court are not controlling in the context of the
dispute at issue here.  Nevertheless, the decision provides useful guidance.

business in Illinois and sustained its losses there, although the Debtor is a resident of Massachusetts. This Court finds that "special significance" should be given to Illinois law because the Fund relied on and was the victim of the Debtor's deceptive conduct in Illinois.

The Debtor cites only one case in support of his opposition to the application of Illinois law, a tort case, <u>Cosme v. Whitin Machine Works, Inc.</u>, 417 Mass. 643, 632 N.E.2d 832 (1994). In that case, the court stated:

> Traditionally, in matters of tort, the courts of this Commonwealth apply the substantive laws of the jurisdiction wherein the tort occurred. <i>See</i> <u>Cohen v. McDonnell Douglas Corp.</u>, 389 Mass. 327, 333, 450 N.E.2d 581 (1983). Generally, however, Massachusetts courts will apply their own rules of procedure. <u>Murphy v. Smith</u>, 307 Mass. 64, 66, 29 N.E.2d 726 (1940). Where it is not clear that a rule of law is procedural in the Commonwealth for choice-of-law purposes, we take a functional approach in determining the choice-of-law issue, using established conflicts criteria and considerations. <i>See</i> <u>Bushkin Assocs., Inc. v. Raytheon Co.</u>, 393 Mass. 622, 631-636, 473 N.E.2d 662 (1985).

<u>Cosme</u>, 417 Mass. at 645. The court in <u>Cosme</u> also stated:

> In examining conflicts issues using a functional approach, "we have not elected by name any particular choice-of-law doctrine." <u>Bushkin Assocs., Inc.</u>, <i>supra</i> 393 Mass. at 631, 473 N.E.2d 662. Rather, we consider choice-of-law issues "by assessing various choice-influencing considerations," <u>id.</u>, including those provided in the Restatement (Second) of Conflict of Laws (1971), and those suggested by various commentators. <i>See</i> <u>id.</u> at 631-632, 473 N.E.2d 662; <u>Cohen</u>, <i>supra</i> 389 Mass. at 336, 450 N.E.2d 581.

<u>Id.</u> at 646. The <u>Cosme</u> court cited, <i>inter alia</i>, Restatement (Second) of Conflict of Laws § 6, entitled "Choice of Law Principles," which provides in part:

> The factors relevant to the choice of the applicable rule of law include (a) the needs of the interstate and international systems, (b) the relevant policies of the forum, (c) the relevant policies of other interested states and the relative

11

interests of those states in the determination of the particular issue, (d) the protection of justified expectations, (e) the basic policies underlying the particular field of law, (f) certainty, predictability and uniformity of result, and (g) ease in the determination and application of the law to be applied.

Id. at 647 n. 6.[6]

Although the Debtor maintains that Massachusetts has the most significant contacts, this Court disagrees for the reasons set forth above. Moreover, the Debtor has neither advanced any reason for believing that the needs of the interstate or international systems would be advanced by the application of Massachusetts law rather than Illinois law nor addressed the relevant policies of the interested states in the application of their respective statutes permitting the accrual of prejudgment interest. The Debtor also failed to address any of the other factors set forth in § 6 of the Restatement (Second).

---

[6] The Cosme court also cited Restatement (Second) of Conflict of Laws § 145 (1971), entitled "The General Principle." It provides:

(1) The rights and liabilities of the parties with respect to an issue in tort are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the occurrence and the parties under the principles stated in [Restatement (Second) of Conflict of Laws] § 6.

(2) Contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include: (a) the place where the injury occurred, (b) the place where the conduct causing the injury occurred, (c) the domicil [sic], residence, nationality, place of incorporation and place of business of the parties, and (d) the place where the relationship, if any, between the parties is centered.

These contacts are to be evaluated according to their relative importance with respect to the particular issue.

Cosme, 417 Mass. at 647 n. 3.

12

With respect to a plaintiff's entitlement to prejudgment interest, both Illinois and Massachusetts view entitlement to prejudgment interest as matters of substantive law[7] and as means to fully compensate plaintiffs for their losses. Courts in Illinois have recognized that awards of prejudgment interest are necessary in order to give winning plaintiffs full compensation for their damages. Zayre Corp. v. S.M. & R. Co., 882 F.2d 1145, 1157 (7th Cir. 1989). In Massachusetts, courts have made similar pronouncements. The court in McEvoy Travel Bureau, Inc. v. Norton Co., 408 Mass. 704, 717 (1990), for example, stated that ("[t]he purpose of prejudgment interest under G.L. c. 231, § 6B, is 'to compensate a damaged party for the loss of use or the unlawful detention of money.'" It added: "The damaged party is entitled to a return on the money that the party would have had but for the other party's wrongdoing. To give the damaged party more than that would go beyond the purpose of the statute. The purpose behind the prejudgment interest statute is not to penalize the wrongdoer, or to make the damaged party more than whole." Id. at 717 (citations omitted).

Restatement (Second) of Conflicts of Laws provides that "[t]he law selected by

---

[7] According to the court in Obermaier v. Obermaier, 128 Ill. App. 3d 602, 610, 470 N.E.2d 1047, 1054 (1984),

> There is no right to recover prejudgment interest absent a statute or agreement. The right to such interest in Illinois is authorized by statute. (Ill.Rev.Stat.1981, ch. 17, par. 6402.). Similarly, in Massachusetts, courts have determined prejudgment interest is substantive. See AT & T Capital Leasing Services, Inc. v. Brasch, 912 F.Supp. 395 (N.D. Ill. 1996). In that case, the court observed that Mass. Gen. Laws Ch. 231, § 6C is a substantive remedy.

13

application of the rule of § 145 determines the measure of damages." Comment c to § 145

specifically provides that "[t]he law selected by application of the rule of § 145 determines

whether the plaintiff can recover interest and, if so, at what rate for a period prior to the

rendition of judgment as part of the damages for a tort." *See also* Perlman v. Zell, 185 F.3d

850, 857 (7th Cir. 1999)("Prejudgment interest depends on the law that supplies the

substantive rule of decision. . . .").

>    In Illinois,
>
>    Creditors shall be allowed to receive at the rate of five (5) per centum per
>    annum for all moneys after they become due on any bond, bill, promissory
>    note, or other instrument of writing; on money lent or advanced for the use
>    of another; on money due on the settlement of account from the day of
>    liquidating accounts between the parties and ascertaining the balance; on
>    money received to the use of another and retained without the owner's
>    knowledge; and on money withheld by an unreasonable and vexatious delay
>    of payment. In the absence of an agreement between the creditor and debtor
>    governing interest charges, upon 30 days' written notice to the debtor, an
>    assignee or agent of the creditor may charge and collect interest as provided
>    in this Section on behalf of a creditor.

815 Ill. Comp. St. Ann. 205/2. This statute and its predecessor, Ill.Rev.Stat.1981, ch. 17,

par. 6402, have been interpreted to provide for interest, in the absence of agreement, in four

instances: "(1) on money lent or advanced for the use of another; (2) on money due on the

settlement of account from the day of liquidating accounts between the parties and

ascertaining the balance; (3) on money received to the use of another and retained without

the owner's knowledge; and (4) on money withheld by an unreasonable and vexatious

delay of payment." LaBarbera v. LaBarbera, 116 Ill. App.3d 959, 967-68, 452 N.E.2d 684, 690

(1983). Additionally, courts in Illinois award prejudgment interest in cases of fraud. *See*

14

Obermaier, 128 Ill.App.3d at 610, 470 N.E.2d at 1054 (Section 2 of an Act in relation to * * *

interest * * *, is applicable to judgments in fraud cases"); Forrester v. State Bank of East

Moline, 52 Ill.App.3d 34, 6 Ill.Dec. 957, 363 N.E.2d 904 (1977); Pfeffer v. Farmers State Bank

of Schaumburg, 263 Ill.App. 360 (1931).  See also Lovejoy Electronics, Inc. v. O'Berto, 873

F.2d 1001 (7th Cir. 1989).  In Lovejoy, the court stated:

> The only remaining question that warrants discussion— and that briefly—is
> the award of prejudgment interest to both parties. So far as the unpaid
> royalties are concerned, there is no problem; an Illinois statute provides for
> prejudgment interest on moneys due on a written contract. Ill.Rev.Stat. ch.
> 17, ¶ 6402 [the predecessor to §205/2]. The statute says nothing about fraud,
> however, and the Illinois courts, as we explained in Needham v. White
> Laboratories, Inc., 847 F.2d 355, 362 (7th Cir.1988), are reluctant to go beyond
> the statute. But there is a reasonably well established exception to this
> judicial modesty, precisely for cases of fraud, where the tradition of
> awarding prejudgment interest predates the statute and has been held to
> have survived its enactment. See, e.g., 612 North Michigan Ave. Bldg. Corp.
> v. Factsystem, Inc., 54 Ill.App.3d 749, 754-55, 12 Ill.Dec. 613, 618, 370 N.E.2d
> 236, 241 (1977).

Id. at 1007.

In view of the provisions of Illinois law permitting prejudgment interest from the

time the fraud commenced, this Court shall enter an order awarding prejudgment interest

commencing with the first pension check the Debtor fraudulently endorsed in May of 1982.

### B. The Fund's § 727(a)(2) Count

#### 1. Undisputed Facts

The Debtor in his post-hearing memorandum recites the following chronology of

events, referencing exhibits submitted by the Fund in conjunction with its Statement of

Undisputed Material Facts in Support of Motion for Summary Judgment.

15

| 12/13/02 | The Fund applied for a writ of attachment on the home equity line of credit at Citizens Bank |
| 1/03 | The Debtor wrote a check on his home equity line for $60,000 and deposited the money at the Cambridgeport Bank |
| 1/30/03 | The Debtor filed an affidavit disclosing that he had $60,000 in the Cambridgeport Bank |
| 2/14/03 | The Debtor was deposed by the Fund and disclosed that he deposited $60,000 in the Cambridgeport Bank from his Citizens home equity line |
| 3/5/03 | A writ of attachment issued to Citizens Bank on the Debtor's home equity credit line |

### 2. Position of the Parties

The Debtor maintains that "the $60,000 that he drew down by check on his home equity line at Citizens Bank was not done with an intent to hinder, delay or defraud creditors, but was done for living expenses." The Fund rejects the Debtor's position, making alternative arguments. First, it maintains that the Debtor waived any arguments with respect to its § 727(a)(2) count by failing to raise them in his opposition to its Motion. Citing Aubrey v. Thomas (In re Aubrey), 111 B.R. 268, 273 (B.A.P. 9th Cir. 1990), it also maintains that it has established that the debtor transferred or concealed property; the property belonged to the debtor; that the transfer occurred within one year of the bankruptcy; and the debtor executed the transfer with intent to hinder, delay, or defraud a creditor. Specifically, it asserts that it has satisfied the first three elements and that the final element can be proved by circumstantial evidence. The Fund points to the Debtor's affidavit which omits any reference to the source of the $60,000 in the Cambridgeport account, stating that the Debtor "was obligated not to take any money from his Home

16

Equity Credit Line while the District Court was considering whether to issue the Writ for the Fund's protection."

### 3. Summary Judgment Standard and Analysis

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); Fed. R. Bankr.P. 7056.  In <u>Read & Lundy, Inc. v. Brier (In re Brier)</u>, 274 B.R. 37 (Bankr. D. Mass. 2002), this Court observed:

> A material fact is one which has the 'potential to affect the outcome of the suit under the applicable law.' Thus, the nonmovant bears the burden of placing at least one material fact into dispute once the moving party offers evidence of the absence of a genuine issue. In other words, neither 'conclusory allegations, improbable inferences, and unsupported speculation,' nor '[b]rash conjecture coupled with earnest hope that something concrete will materialize, is [ ] sufficient to block summary judgment.' (Citing <u>Crawford v. Lamantia</u>, 34 F.3d 28, 31 (1st Cir.1994) (citations omitted)). Although the nonmovant is required to place a material fact in issue, in ruling on a summary judgment motion, this Court is required to "draw all reasonable inferences from the facts in the manner most favorable to the nonmovant." <u>Braunstein v. Beatrice (In re Beatrice)</u>, 296 b.R. 576, 579 (B.A.P. 1st Cir. 2003)(citing <u>Desmond v. Varrasso (In re Varrasso)</u>, 37 F.3d 760, 763 (1st Cir.1994); <u>Piccicuto v. Dwyer</u>, 39 F.3d 37, 40 (1st Cir.1994)).

<u>Id.</u> at 42.

In this case, the Debtor's intent to hinder, delay, or defraud a creditor is in issue. The exhibits on file simply do not resolve the issue of the Debtor's intent when inferences are drawn in his favor, particularly when the Debtor's depression is considered. Accordingly, the Court shall enter an order denying the Fund's Motion with respect to the

17

§ 727(a)(2) count.[8]

    C. <u>Attorneys' Fees and Costs</u>

    The Court denies the Fund's request for attorneys' fees and costs. It has submitted no factual or legal basis for diverging from the American Rule that litigants bear their own fees and expenses. *See* <u>Bridgewater Credit Union v. McCarthy</u> (<u>In re McCarthy</u>), 243 B.R. 203 (B.A.P. 1st Cir. 2000). In <u>McCarthy</u>, the bankruptcy appellate panel stated:

> The general rule in federal litigation is the "American Rule," under which the prevailing litigant is not entitled to collect his reasonable attorney's fees from his opponent unless authorized by statute or provided for by contract. *See* <u>Alyeska Pipeline Serv. Co. v. Wilderness Soc'y</u>, 421 U.S. 240, 247, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975); <u>In re Sheridan</u>, 105 F.3d 1164, 1166 (7th Cir.1997) (rehearing en banc denied). The courts do not have "roving authority" to award counsel fees whenever they might consider it warranted. <u>Roosevelt Campobello Int'l. Park Comm'n v. EPA</u>, 711 F.2d 431, 435 (1st Cir.1983) (quoting <u>Alyeska Pipeline Serv. Co.</u>, 421 U.S. at 260, 95 S.Ct. 1612).

    The American Rule reigns in the bankruptcy forum. . . .

<u>McCarthy</u>, 243 B.R. at 207.

---

[8] The Court is compelled to observe that if the $20,000 claim arising out of an automobile accident is covered by the Debtor's insurance provider, then any trial with respect to the § 727(a)(2) count would involve the discharge of two credit card debts totaling $876.87.

## IV. CONCLUSION

In view of the foregoing, the Court shall enter a judgment granting the Fund's Motion with respect to count I and denying its Motion with respect to Count II. The Fund shall be entitled to judgment in the principal sum of $316,678.16 plus prejudgment interest calculated in accordance with Illinois law.

By the Court,

Joan N. Feeney
United States Bankruptcy Judge

Dated:  June 8 2004
cc: William W. Leathem, Esq., Robert Mendillo, Esq.

19

# United States Bankruptcy Court
## District of Massachusetts

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

In re
**PHILLIP W. HYDE,**
Debtor

Chapter 7
Case No. 03-14530-JNF

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

### ORDER

Upon consideration of 1) the Motion of Debtor to Avoid Lien Pursuant to 11 U.S.C.

§522(f); 2) the Creditor's Opposition to Motion of Debtor to Avoid Lien Pursuant to 11

U.S.C. § 522(f) filed by the Board of Trustees of the Public School Teachers' Pension and

Retirement Fund of Chicago (the "Fund'); 3) the representations and arguments of counsel

made at the hearing on May 5, 2004, including the agreement as to the value of the Debtor's

property located at 26 Union Street, Cambridge, Massachusetts ($510,000); and 4) the

decision of the United States Court of Appeals for the First Circuit in Patriot Portfolio, LLC

v. Weinstein (In re Weinstein), 164 F.3d 677 (1st Cir. 1999), cert. denied, 527 U.S. 1036 (1999),[1]

---

[1] In Weinstein, the First Circuit stated the following:

Like the bankruptcy court and the district court below, we are persuaded
by Judge Feeney's analysis of the conflict in In re Whalen-Griffin. As
Judge Feeney recognized, the Massachusetts exceptions overlap and
conflict with § 522(c). See 206 B.R. at 290. While both statutes limit the
debts for which exempt property remains liable, the Massachusetts

1

exceptions protect debts left unprotected by § 522(c). We agree with Judge
Feeney's conclusion that:

> Because the exceptions to the Massachusetts homestead have
> the same effect on the homestead as the exceptions set forth
> in § 522(c), . . . the Massachusetts homestead statute is
> preempted to the extent that it permits exempt property to
> be liable for debts other than those expressly enumerated in
> § 522(c)(1)- (3), particularly because the language employed
> by Congress in § 522(c) is devoid of ambiguity.

206 B.R. at 291-92. On this basis, we conclude that section 1(2) of the
homestead statute is preempted by § 522(c) of the Code. See Rini v. United
Van Lines, Inc., 104 F.3d 502, 504 (1st Cir.1997) ("[A] state statute is void to
the extent it is in conflict with a federal statute." (citing U, 451 U.S. 725,
747, 101 S.Ct. 2114, 2129, 68 L.Ed.2d 576 (1981))), cert. denied, 522 U.S. 809,
118 S.Ct. 51, 139 L.Ed.2d 16 (1997). Our conclusion is consistent with
numerous decisions in other jurisdictions holding that a state's exceptions
to its homestead exemption are preempted by the Bankruptcy Code. See,
e.g., In re Maddox, 15 F.3d 1347, 1351 (5th Cir.1994) (holding that lien
avoidance under § 522(f) is not limited by state exceptions); In re
Opperman, 943 F.2d 441, 443 (4th Cir.1991) (holding that limitation in
North Carolina homestead statute was invalid to the extent it conflicted
with operation of § 522(f)); In re Scott, 199 B.R. 586, 591-93
(Bankr.E.D.Va.1996) (holding that intentional tort exclusion in Virginia
exemption statute conflicts with and is preempted by § 522(c)); In re
Conyers, 129 B.R. 470, 472 (Bankr.E.D.Ky.1991) (concluding that "the
determination of the types of debts that remain collectible after
bankruptcy from exempt property is controlled by federal rather than
state law").

In so holding, we again reject Patriot's insistence that the courts below
and the cited Massachusetts bankruptcy courts have all misconstrued the
unique character of the Massachusetts homestead exemption. We do not
view the Massachusetts statute's creation of an "estate of homestead" to
be so markedly different from the homestead exemptions available under
federal or other state's laws that it need not yield to the overriding policies
of § 522(c). See In re Leicht, 222 B.R. at 680 ("[W]e decline [the creditor's]
invitation to recognize the Massachusetts homestead as so different in
character from other exemptions that § 522(c)'s fresh start mechanism
cannot operate to enlarge its protections.").

164 F.3d at 683.

the Court hereby overrules the Fund's Opposition and grants the Debtor's Motion.

By the Court,

Joan N. Feeney
United States Bankruptcy Judge

Dated:  June 18, 2004
cc: William W. Leathem, Esq., Robert Mendillo, Esq.

3

22

AUG 31 '04 AM 10:00 USB

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MASSACHUSETTS
EASTERN DIVISION

IN RE:

PHILLIP W. HYDE
        Debtor

CHAPTER 7

CASE NO.   03-14530-JNF

### RESPONSE BY PHILLIP W. HYDE
### TO MOTION TO DISMISS UNDER §707(a)

Now comes Phillip W. Hyde ("Hyde" or "Debtor") and responds

to the MOTION TO DISMISS UNDER §707(a) ("Motion") of the Board of

Trustees of the Public School Teachers' Pension and Retirement

Fund of Chicago ("Fund") as follows:

#### I.   INTRODUCTION

The Fund received a pre-petition attachment on Hyde's
residence which this Court avoided as it impaired Hyde's
homestead exemption.  The Fund appealed this Court's ruling.[1]
The Fund's present grievance is not with the Debtor but with the
fact that Bankruptcy Code ("Code") only permits a debtor's exempt
assets to be liable for certain specific debts set forth in 11
U.S.C., § 522(c), which type of debt the Fund does not hold.  As
a consequence of same, the First Circuit has determined that the
"exception" portion of the Massachusetts homestead statute[2] has
been preempted.[3]  The Fund having had its lien avoided is now
attempting to do, by indirection, what it could not do by
direction, i.e, seeking a dismissal of Debtor's case so that its
pre-petition attachment would be reinstated.  It is not the

---

[1]Subsequent to the filing of the instant Motion, the Fund
agreed with the Debtor to dismiss the appeal if the Debtor would
stipulate to the dismissal of same.  The Debtor agreed and a
stipulation of dismissal as to the appeal has been filed with the
district court.

[2]M.G.L.c. 188, § 1.

[3]Patriot Portfolio, LLC v. Weinstein (In re Weinstein), 164
F.3d 677 (1st Cir. 1999), cert denied, 527 U.S. 1036 (1999).

Debtor who is employing "scorched earth" tactics of which the Fund complains but, rather, it is the Fund.[4]

## II.    AFFIRMATIVE RESPONSES[5]

### A.    HYDE HAS SHOWN NO BAD FAITH, WHATSOEVER, IN THIS PROCEEDING

In this proceeding, the Debtor has timely filed all required schedules and statements; has attended and testified at the meeting of creditors held pursuant to 11 U.S.C., §341; has paid all required fees; and has timely filed his statement of intention.

Notwithstanding the Debtor's compliance with the Code and the applicable Bankruptcy Rules, the Fund argues that the Debtor is acting in bad faith.  The Fund would have this Court believe that every debtor who has ever committed a wrong, pre-petition, has, _per se_, acted in bad faith and, therefore, such a debtor was not entitled to relief pursuant to the Code.  The Fund's position

---

[4]Examples of the Fund's use of the "scorch earth" tactics include, but are not limited to, the fact that although the Fund has received a judgment pursuant to 11 U.S.C., § 523, declaring that its debt is nondischargeable, it continues to attempt to have all of the Debtor's claims to be determined nondischargeable pursuant to 11 U.S.C., § 727; its aggressive position seeking dismissal of this case when its debt has already been determined to be nondischargeable; and the Fund's pressing for attorney's fees in the adversary action when it had "submitted no factual or legal basis for diverging from the American Rule that litigants bear their own fees and expenses."  (Board of Trustees of the Public School Teachers' Pension and Retirement Fund of Chicago v. Phillip Hyde, Adversary No. 03-1358, MEMORANDUM of June 18, 2004 at 18.)

[5]The Fund sets forth its argument in section 4 of the Fund's Memorandum, wherein it suggests three (3) grounds that it believes support its request that this Court dismiss the petition.  The instant affirmative responses respond to those three (3) arguments.

is simply not the law.  As an example of the Debtor's alleged bad faith, the Fund argues that "Debtor claimed the $300,000 Massachusetts homestead exemption rather than the less general Federal exemption amount and then successfully moved to avoid the Fund's lien." (MEMORANDUM IN SUPPORT OF MOTION TO DISMISS UNDER §707(a), page 20, hereinafter referred to as "Fund's Memorandum.")

The Fund argues that the Debtor should renounce exemptions that are available to debtors, which exemptions are provided by either federal or state law.  Debtors, obviously, have the right to employ exemptions.  As Massachusetts is not an "opt-out state," a debtor has the option of either employing the exemptions set forth in 11 U.S.C., § 522(d) or exemptions which are provided pursuant to state, local or other non-bankruptcy federal law.[6]  The Massachusetts Legislature has consistently exhibited the importance of the homestead exemption by regularly increasing the value of the homestead exemption.  A very visible example of the Massachusetts Legislature's unyielding support of the homestead exemption is evidenced by the fact that on July 28, 2004, a bill was enacted increasing the protection afforded by a Massachusetts declaration of homestead filed pursuant to either M.G.L.c. 188, § 1 or § 1A, from $300,000 to $500,000.[7]  In situations where there are married homeowners and they both are eligible for a homestead pursuant to M.G.L.c. 188, § 1A, the

---

[6]11 U.S.C., § 522(b).

[7]Chapter 218 of the Acts of 2004.