UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
_____
BOARD OF TRUSTEES OF THE PUBLIC  )
SCHOOL TEACHERS' PENSION AND     )
RETIREMENT FUND OF CHICAGO,      )
            Appellant-Creditor,  )
                                 )
        v.                       )
                                 )   CIVIL ACTION NO. 04-12378-RCL
PHILLIP W. HYDE,                 )
            Appellee-Debtor.     )
_____)
```

## MEMORANDUM AND ORDER

LINDSAY, District Judge.

The Board of Trustees of the Public School Teachers' Pension and Retirement Fund of Chicago (the "Fund") has appealed an order of Chief Judge Feeney of the bankruptcy court denying its motion to dismiss under 11 U.S.C. § 707(a). Specifically, the Fund claims that the court erred in finding that "bad faith" does not constitute "cause" under § 707(a) and in finding that, in any event, the conduct of the debtor in question in this case does not support a finding of bad faith, warranting dismissal. After careful consideration of the parties' arguments, the orders of the bankruptcy court in this case, and the record of proceedings in the bankruptcy court, I AFFIRM the decision of the bankruptcy court.

### Facts and Procedural History[1]

The Fund is a public-employee, pension fund that provides pension benefits to retired teachers of the Chicago Board of Education. Philip Hyde (the "debtor") is the son of one Marian

---

[1]The facts set forth below are undisputed and are derived from the bankruptcy court's June 18, 2004 order on the Fund's motion for summary judgment. As detailed later in the text of this memorandum, the Fund, pursuant to 11 U.S.C. 523(a)(2)(A), first sought, by motion for summary judgment, to preclude the discharge of the debt at issue, arising from the misappropriation of pension payments and to preclude discharge of the debtor generally under 11 U.S.C. §727(a)(c). After the summary judgment motion was denied, the Fund moved to dismiss the petition. When that effort also failed, this appeal ensued.

Hyde, who retired from her job as a public school teacher on June 22, 1968. Shortly after her retirement, Ms. Hyde began to receive monthly retirement benefits from the Fund. On April 28, 1982, she died at the age of 83. The debtor never informed the Fund about his mother's death and, at that time, the Fund had no way of determining whether its pensioners were still living. Consequently, the Fund, unaware of Ms. Hyde's death, continued to mail monthly pension payments to her at the debtor's address in Cambridge, Massachusetts. Thus, from May 1982 to August 2000, the debtor took the checks representing the pension payments, forged Ms. Hyde's endorsement on the back of them, and used the proceeds for purposes of his own.

The debtor also took specific actions to conceal his mother's death from the Fund and to induce the Fund to continue mailing pension payments to him. For instance, in September 1997, fifteen years after Ms. Hyde's death, the Fund sent a letter to what it then believed to be Ms. Hyde's mailing address (but actually the debtor's address), requesting that Ms. Hyde verify receipt of her September 1997 check by returning a notarized form, along with a copy of her social security card. Over a month later, the debtor returned the form with a notarized signature purporting to be that of his mother. The form was accompanied by the following handwritten note:

> Dear Pension People:
>
> We are sorry for the delay in returning this form to you. The letter was put aside and just re-discovered. Marian is frail and has good days and bad days and is difficult to get out of the house. We can't seem to find her current social security card and will look further and re-apply if we can't find it.
>
> I hope all is well. Thank you again for your support.
>
> The Hydes.

The Fund, relying on the handwritten note and notarized signature, continued to mail benefit payments to Ms. Hyde, sending them to the debtor's residence in Cambridge. In August 2000, an employee of the Fund called the telephone number listed for Ms. Hyde and spoke to the debtor, who described himself as Ms. Hyde's son. The debtor told the representative of the Fund that his mother was in a coma after suffering a stroke. The Fund consulted its health insurance database and learned that there had been no claims filed on her behalf. Immediately thereafter, in or around August 2000, the Fund stopped issuing checks to Ms. Hyde.

Shortly after receiving the call from the Fund, the debtor wrote a letter to the Fund stating: "Sadly, please be informed that my mother Marian Ward Hyde passed away on August 9. She died at our Cambridge home peacefully and quietly. As I told you she has been comatose since July 7, so we hope she did not suffer." The debtor also included a fictitious obituary, which purported to show August 9, 2000, as the date of his mother's death.

As a result of the debtor's actions, the Fund lost $317,678.16, which included. $269,411.53 in issued pension checks; $25,222.65 in withholding taxes remitted to the United States Department of the Treasury; $14,024.73 in health insurance premiums; and $9,019.25 in issued rebate checks relating to health insurance premium overpayments.

By letter dated January 18, 2002, the Fund made a demand on the debtor for $317,678.16, plus statutory penalties, interest, costs, and fees. Thereafter, on May 21, 2002, the Fund filed suit against the debtor in this court for fraudulent conversion and sought as damages the amounts described in the demand letter. In the ensuing civil proceeding, the debtor invoked his Fifth Amendment right against self-incrimination and refused to answer any questions regarding his culpability for the misappropriated benefit payments. On October 25, 2002, the district court

issued a writ of attachment for $317,678.16 against the debtor's house in Cambridge, Massachusetts. The Fund moved for summary judgment and the debtor received a two-week extension to file a response to the Fund's motion. On May 28, 2003, the day before his opposition was due, the debtor filed a Chapter 7 bankruptcy petition.

On August 13, 2003, the Fund filed a two-count complaint seeking a declaration from the bankruptcy court that the debt to the Fund is non-dischargeable under 11 U.S.C. § 523(a)(2)(A), entitling it to a judgment for $317,678.16 (count I) and a declaration denying the debtor a discharge under 11 U.S.C. § 727(a)(2)(A) (count II).[2] On June 18, 2004, the bankruptcy court granted the Fund's motion as to count I for a non-dischargeable judgment against the debtor and denied it as to count II.

The debtor proceeded to schedule the Fund as a secured creditor and claimed a $300,000 Massachusetts homestead exemption. Then, on January 29, 2004, he filed a motion seeking to avoid the Fund's attachment lien on his home, pursuant to 11 U.S.C. § 522(f), on the ground that the attachment impaired his Massachusetts homestead exemption. On June 18, 2004, the bankruptcy court granted the debtor's motion. The Fund then moved the court to dismiss the debtor's bankruptcy petition on the ground of bad faith under § 707(a). After hearing argument on September 13, 2004, Judge Feeney denied the Fund's motion and wrote "the moving party has failed to demonstrate 'cause' for dismissal under 11 U.S.C. § 707(a)." Thereafter, the Fund filed a timely appeal to this court.

---

[2]Meanwhile, on May 12, 2004, the debtor pleaded guilty to federal mail fraud charges, arising from the misappropriation of the pension payments.

**Analysis**

A.      Standard of Review

In reviewing a bankruptcy court's decision, a district court applies the *de novo* standard to conclusions of law, *Grella v. Salem Five Cent Sav. Bank*, 42 F.3d 26, 30 (1st Cir.1994), and the "clearly erroneous" standard to findings of fact. Fed. R. Bankr. P. 8013.[3] Generally, the denial of a motion to dismiss is a non-appealable, interlocutory order. *In re Empresas Noroeste, Inc.*, 806 F.2d 315, 317 (1st Cir. 1986) (stating that "[a]n order denying a motion to dismiss . . . is a common example of what is normally [an] interlocutory order.") (collecting cases). However, in this case, the bankruptcy court's ruling that the debtor's conduct does not amount to bad faith effectively determines the outcome of the litigation as to this issue, because the court is not likely to reconsider its decision, *and* the Fund has no other avenue to seek reconsideration or appeal of this decision. In other words, in contrast to most denials of a motion to dismiss, which merely allow a case to proceed to trial, there is no prospect here that the bankruptcy court will to revisit this issue before the conclusion of the bankruptcy proceedings.

B.      Section 707(a)

Section 707(a) of the Bankruptcy Code provides for the dismissal of a proceeding after notice and a hearing and then only for cause. *See* 11 U.S.C. § 707(a) ( "The Court may dismiss a case under this chapter only after notice and a hearing and only for cause"). The section does not define "cause;" instead it gives three examples of actions by the debtor which constitute "cause":

---

[3]This rule provides, in pertinent part, that the bankruptcy court's "[f]indings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the bankruptcy court to judge the credibility of the witnesses."

> (1) unreasonable delay by the debtor that is prejudicial to creditors; (2) nonpayment of any fees or charges required under chapter 123 of title 28; and (3) failure of the debtor in a voluntary case to file, within fifteen days or such additional time as the court may allow after the filing of the petition commencing such case, the information required by paragraph (1) of section 521, but only on a motion by the United States trustee.

*Id.* Because the examples set forth above are merely illustrative and not exhaustive, a court may dismiss a bankruptcy case on other grounds where it finds that "cause" exists. *See In re Zick*, 931 F.2d 1124, 1126 (6th Cir.1991); *In re Padilla*, 222 F.3d 1184, 1191 (9th Cir. 2000) (citing 11 U.S.C. § 102(3)) (defining "including," for purposes of Title 11, to be "not limiting"). The only congressional guidance on the meaning of the term "cause" is the assertion in the pertinent House report that the "ability of the debtor to repay his debts in whole or in part [does not] constitute[ ] adequate cause for dismissal." H.R. Rep. 95-595, at 380 (1978), *reprinted* in 1978 U.S.C.C.A.N. 5963, 6336.

Several courts have concluded that a debtor's lack of good faith can constitute "cause" for dismissal under section 707(a). *See, e.g., Zick* 931 F.2d at 1127; *In re Tamecki*, 229 F.3d 205, 207 (3rd Cir. 2000).[4] Other courts have held that bad faith per se does not constitute "cause" for dismissal under section 707(a). *United States v. Padilla (In re Padilla)*, 222 F.3d 1184, 1194 (9th Cir.2000); *see also Huckfeldt v. Huckfeldt (In re Huckfeldt)*, 39 F.3d 829, 832 (8th

---

[4]Although the First Circuit has examined dismissal under 11 U.S.C. § 707(b), *see In re Lamanna*, 153 F.3d 1 (1st Cir. 1998), it has not addressed the standard for dismissal pursuant to 11 U.S.C. § 707(a). One bankruptcy court in this circuit has held that there § 707(a) does allow for dismissal upon a creditor's showing of bad faith. *See In re Marsico*, 2004 WL 97647 (Bankr. D. N.H. Jan. 5, 2004) (noting that courts either apply a "bad faith" test or a "smell" test). However, Judge Feeney, in a more recent decision, has adopted the contrary view, concluding, as she did in the case now before me, that bad faith or lack of good faith cannot constitute "cause" for dismissal under section 707(a). *In re Linehan*, 326 B.R. 474, 481-82 (Bankr. D. Mass. 2005).

Cir.1994) (stating that the proper analytical framework under section 707(a) should not be whether a debtor is acting in bad faith, but whether the bankruptcy petition should be dismissed "for cause").

One non-judicial, but highly regarded authority, has opined that, "the power to dismiss a chapter 7 case for lack of good faith, if it exists at all, is extremely limited." 6 LAWRENCE P. KING, COLLIER ON BANKRUPTCY ("COLLIER"), ¶ 707.03[2]( 15th rev. ed. 2001). Moreover, according to COLLIER, a finding that "the debtor is merely taking advantage of its legal rights is not, by itself, sufficient to support a finding of bad faith." *Id.* (*citing In re Motaharnia*, 215 B.R. 63 (Bankr. C.D. Cal. 1997) and *In re Bingham*, 68 B.R. 933 (Bankr. M.D. Pa. 1987)). In addition, dismissal under section 707(a) is not an appropriate vehicle to address the kind of specific malfeasance that is addressed by other provisions of the Bankruptcy Code, including exceptions to discharge. *Id.* (*citing In re Padilla*, 222 F.3d 1184). Finally, it is worth noting that in evaluating a motion to dismiss pursuant to section 707(a), the court has "substantial discretion." *See* COLLIER, ¶ 707.03[1].

Upon review of the record before me, I affirm the ruling of the bankruptcy court, because I find that, even if Judge Feeney erred as a matter of law in finding that "bad faith" does not constitute cause for dismissal under section 707(a), (a matter as to which I express no view), the facts in this case do not demonstrate that the judge abused her discretion in determining that the Fund did not establish that the debtor has acted in bad faith. Reaching this conclusion, I have applied the standard set forth in *Zick*. In that case, the Sixth Circuit concluded that a bad faith dismissal "should be confined carefully and is generally utilized only in those egregious cases that entail concealed or misrepresented assets and/or sources of income, and excessive and continued

expenditures, lavish lifestyle, and intention to avoid a large single debt based on conduct akin to fraud, misconduct, or gross negligence." *Zick*, 931 F.2d at 1129. I see nothing in the record that indicates that the debtor has engaged in the kind of conduct that marks bad faith as described in *Zick*.

Notwithstanding the absence of the factors described above, the Fund seeks dismissal of this case because, it claims that the debtor manipulated the "entire judicial system" by seeking bankruptcy relief to avoid an adverse ruling on summary judgment; the debtor sought a homestead exemption to avoid the Fund's lien; and that the debtor targeted the Fund, among all of his creditors, for special abuse. Appellant's Brief ("Fund's Br.") at 38- 40. While the debtor's pre-petition conduct is far from exemplary, it seems to me that the conduct that the Fund cites as instances of bad faith are merely examples of circumstances in which the debtor, albeit to the disadvantage of the Fund, has availed himself of rights available to him under the bankruptcy laws.

The Fund first complains that the petitioner filed a bankruptcy petition to avoid an adverse ruling on a motion for summary judgment in a separate proceeding. Of course, it would have been better had the debtor faced the music in the separate civil proceeding. But that he did not do so does not constitute bad faith. One court has concluded that this kind of strategy is consistent with sound, if aggressive, legal maneuvering. *See In re Bingham*, 68 B.R. 933, 936 (Bankr. M.D.Pa. 1987) ("The fact that the debtor filed his petition on the eve of a change in the bankruptcy law evidences a thorough knowledge of his rights, not that the debtor filed his petition in bad faith. Thus, the debtor's decision to take advantage of the bankruptcy laws does not convince this Court that his petition was filed in bad faith.").

At the heart of the Fund's objection in this case, of course, is the debtor's successful avoidance of the Fund's lien on his real property by the invocation of a homestead exemption. The Fund argues that the debtor's claim of a Massachusetts homestead exemption is specious and is irrefutable evidence of bad faith.

Massachusetts state courts interpret homestead laws liberally in favor of debtors because they recognize that "homestead laws tend to prevent debtors and their families from becoming public charges" and "public policy that favors preservation of the family home regardless of the householder's financial condition. *Shamban v. Masidlover*, 429 Mass. 50, (1999). Given this policy, the bankruptcy court's granting of the debtor's motion to avoid the lien, in light of the acquisition of the homestead estate, was well within the boundaries of its discretion. *See In re Miller*, 113 B.R. 98, 104 (Bankr. D. Mass. 1998) ("The very purpose of the homestead law is to put the homestead beyond the reach of creditors . . . . The Debtor can hardly be faulted for having done what the law permits him to do"); *see also* COLLIER, ¶ 7.07.03[2] (noting that the fact that "debtor is merely taking advantage of its legal rights is not, by itself, sufficient to support a finding of bad faith.").

Finally, the record does not support the Fund's claim that it was targeted by the debtor for special abuse. It is clear that the Fund was disadvantaged by the debtor's maneuvers. The record, however, does not reveal how other creditors have fared in comparison to the Fund. In any case, as discussed above, the debtor has done nothing more than avail himself of the protections granted him under Massachusetts and bankruptcy law.

9

For the foregoing reasons, the bankruptcy court's order is AFFIRMED. The clerk shall enter judgment for the appellee-debtor and terminate this case on the court's docket.

SO ORDERED.

/s/ REGINALD C. LINDSAY
United States District Judge

DATED: September 7, 2005